P.H. Keahon, Inc., was a domestic corporation engaged as a public truckman in transporting merchandise in the city of New York. On June 10, 1919, it entered into a contract with the United States *Page 336 
whereby it agreed to transport such merchandise arriving from foreign ports at the port of New York as should be sent for examination to the Appraisers' Stores. The company agreed in its contract to be responsible to the government for all loss, injury or damage to merchandise whether by theft, accident or otherwise, while under its care or custody, and further agreed to furnish a good and sufficient bond in the penal sum of $50,000 for the faithful performance of its agreements. The bond was furnished by the Massachusetts Bonding and Insurance Company, co-defendant in this action.
On the 22d day of June, 1920, the defendant P.H. Keahon, Inc., received from the French line of steamers at the foot of Thirty-first street in Brooklyn, New York, a certain package marked M-123, supposed to contain watches and watch parts which had arrived on the steamship Leopoldina, consigned by the European Watch Clock Co., Inc., of Paris, to the European Watch Clock Co., Inc., of New York. When this package had been unloaded on the pier on the 16th day of June, 1920, it was placed in a locker, bin or crib, made of wire about twenty feet square and ten feet or fifteen feet high, open at the top. The package consisted of cardboard boxes put into a square tin box about six inches in dimension. This box was soldered and hermetically sealed, and then placed in a wooden case. This wooden case was made of white pine, about one-half inch thick. The case bore upon each lateral face, diagonally placed, two seals of red wax, making in all eight seals. This box of watches was left in this crib from June 16th to June 22d, guarded by watchmen and detectives employed by the Vachris Detective Agency and the Mallon Detective Agency.
On June 22, 1920, Coffey with his truck took from the dock or pier fifty packages including that marked M-123, the box supposed to contain the watches. He signed a receipt which had at the top in printing the words, "Received in good order from on board the S.S. *Page 337 Leopoldina * * * the following goods." Then appears the number of the package M-123. He took his load to the Appraisers' Stores situated at Washington, Greenwich and Christopher streets, borough of Manhattan, where it was kept over night and unloaded and examined the next morning. It was then discovered by the inspectors that this package was in bad condition, that one of the seals had been broken and when opened was found to contain stones. The watches had been taken.
Thereafter eight of the watches were found in the pawnshop. On July 27, 1920, while Detective Connolly of the New York police force was in the pawnshop of Joseph Rogers at 510 Lenox avenue a man named Harrison came in to pawn a watch which turned out to be one of the stolen watches. He claimed and swore upon this trial that he received this watch from a friend of his named Roy Lewis who had been with him in the army in France. Later another watch was procured from Anna Harrison, the wife of Charles Harrison. She swore that she had received it from Roy Lewis in order to help get her husband out of jail, for he had been arrested at the time he tried to pawn the watch. Who was Roy Lewis? Roy Lewis was one of the guards upon the pier or wharf employed by the Vachris Detective Agency to watch the discharged cargo of packages. He was on guard from June 15th to June 23d between midnight and eight o'clock in the morning.
These facts appear in this action which was brought against the truckmen and the bonding company to recover by the assignee of the owner for the loss of the stolen watches. The verdict in the plaintiff's favor was unanimously affirmed, the appeal to this court being allowed, however, by an order of the Appellate Division. The case presents a rather narrow issue. The box with the watches had come to this country from France by steamer and was unloaded on a pier in the harbor of New York *Page 338 
on the Brooklyn shore. For nearly six days the package had been in a wire cage on the pier where Roy Lewis was a watcher during the midnight hours. About a month thereafter Roy Lewis had possession of two of these watches and gave them to the Harrisons, the witnesses upon this trial. The defendants' driver had taken the package supposed to contain the watches from the crib or cage and carried it on his truck to the Appraisers' Stores. He signed a receipt which said the package had been received in good condition. The exterior box or wooden container was not produced upon the trial. It had one of the seals apparently broken when Coffey, the driver, delivered it at the Appraisers' Stores. If Lewis, the watchman, stole the goods before they were delivered to Coffey, the defendants are not liable. If the goods were stolen after Coffey had received them, and before he delivered them to the Appraisers' Stores, the truckmen and the bonding company would be liable at least upon the record in this case. It, therefore, was a narrow and simple question for the jury to determine whether the plaintiff had proved by a fair preponderance of evidence that the box was delivered to Coffey in good condition and that its contents had been rifled while in his custody.
Many of the questions which counsel has attempted to argue on this appeal cannot be considered as there are no exceptions which present them as questions of law. There are, however, one or two exceptions which merit examination. Coffey, the defendants' driver, had testified that he had not opened the box and had not taken the watches. Charles Harrison, called by the defendants, testified that the watch which he tried to pawn in the Lenox avenue pawnshop had been received on the same day, July 27, from Roy Lewis. This watch was identified and admitted to be one of the stolen watches. On cross-examination he was asked these questions:
"Q. Where is Roy Lewis now? A. That I do not know, sir. *Page 339 
"Q. Have you ever heard that Roy Lewis was convicted of any crime in this connection?
"Mr. Frankel: That is objected to, if your Honor please.
"The Court: Overruled.
"Mr. Frankel: Exception.
"A. Yes, sir, I have heard so.
"Q. Where? A. My wife told me."
This ruling was erroneous, but the answer did not prejudice these defendants. It was brought out by the plaintiff's counsel on a cross-examination and should have rested there. He, however, improperly pursued the same course with the next witness and this time to the defendants' injury. Clarence D. Connolly, the police officer, was recalled by the defendants, and after being questioned regarding the watches that were returned, he was cross-examined by the plaintiff's counsel as follows:
"Q. Officer, you know that Roy Lewis was never convicted of a crime in connection with this transaction, don't you? A. Yes, sir.
"Mr. Frankel: That is objected to as incompetent, irrelevant and immaterial; the form of the question.
"The Court: Overruled.
"Mr. Frankel: Exception.
"Q. Your answer is, `Yes,' that you do know that? A. That he was never convicted in this case."
Whether or not Roy Lewis was convicted of the crime of stealing the watches was entirely incompetent, irrelevant and immaterial to the issue in this case. (Miller v. Southern Pacific Co.,
20 Oreg. 285, p. 306.) The defendants were not called upon in order to escape liability to prove that Roy Lewis had been convicted of stealing the watches. Neither was it competent to prove that Roy Lewis was not convicted. The prosecution by the People had nothing to do with the case. The parties here are different — the evidence may not be the same — the rules of procedure are unlike. In the criminal action *Page 340 
the People were obliged to prove Lewis guilty beyond a reasonable doubt. The defendants have no such burden here — Keahon Co. as a bailee failing to deliver goods, was only obliged to show with reasonable certainty that the goods were stolen before the package was received by it. (Claflin v. Meyer, 75 N.Y. 260, p. 263.) In fact the plaintiff was bound to prove by a fair preponderance of evidence that the watches were in the package when Coffey, the driver, received it. The plaintiff made out aprima facie case which the defendant could overcome by showing that the watches were taken out of the box before June 22, 1920. This could be proved by circumstantial as well as direct evidence.
The acquittal of Lewis was no answer to the defendants' evidence. We do not know why he was not convicted; the evidence in the criminal case might have been entirely different from the evidence in this case. So many things happen on a criminal trial, as we all know, which result in a verdict of acquittal that it would be very unfair to permit the acquittal in itself to be evidence that somebody else must have taken the property. Roy Lewis may have taken it, and yet have been acquitted. This cross-examination must have been very damaging to the defendants. The issue before the jury really was, did Coffey take the watches or did Lewis, the watchman, take them? Both counsel agree to the issue as stated by respondent in his brief: "The issue in the case was whether Keahon's driver had stolen the watches during his trip from the pier to the Appraisers' Stores on June 22d 1920." When it appeared that Lewis had been acquitted, it would be the natural and hurried inference drawn by laymen that Lewis did not take the watches as the criminal court had so decided. They would not stop to think of that which we lawyers know about the uncertainty of criminal prosecutions, and the inability to retry a man after he has once been acquitted, no matter how much new evidence may come to light. *Page 341 
Furthermore it appears that the officer knew nothing about the discharge of Lewis as he was not present in court.
We think the objection made by the defendants' counsel that this testimony was incompetent, irrelevant and immaterial was taken in time. The answer appears to have gotten in before the objection, but after the ruling the damaging answer was given "that he was never convicted in this case."
A request to charge also needs consideration. The judge charged the jury as follows:
"The defendant has come here and offers evidence upon which it seeks to establish that this property was not lost in its possession. It seeks to overcome the presumption raised against the defendants by showing that some of this property was found in the hands of other witnesses, namely, the Harrisons, and the Harrisons came into possession of the property through one Roy Lewis; Roy Lewis was in the employ of the Vachris Detective Agency, and was on guard on the pier at the time this property was left there in the crib, to wit, from the 16th of June to the 22d of June, when it was taken from there.
"The defendants seek to establish through that testimony, and from that you may draw an inference, that this property was taken by Roy Lewis, that it was stolen by him before the property came into their hands. Has that been established? It is for you to say whether they have overcome the presumption."
At the end of the charge the plaintiff's counsel addressed the court as follows:
"Mr. Cullom: I respectfully except to that portion of your Honor's charge wherein you state that the jury may infer from the testimony of the negroes, Harrison, that the watches came into the possession of Lewis prior to the time of the delivery to Keahon; and I request your Honor to charge that there is no evidence in this case, *Page 342 
either direct or from which the jury may infer that even if the goods came into possession of Lewis they didn't come into his possession while the goods were being transported by Keahon.
"The Court: I withdraw my instruction, and admonish you to disassociate it from your minds and deliberation upon the case, and I charge you as requested by Mr. Cullom. You have the testimony of the Harrisons and you also have the testimony with reference to the employment of Roy Lewis; and that testimony must be considered, together with all the other evidence in the case."
The judge was quite correct in what he had said to the jury about the evidence of the Harrisons by which the defendants attempted to overcome the presumption raised against them from Coffey's possession of the watch box and from the receipt. He should not have withdrawn it. What was there left for the jury upon this point? Nothing whatever. What was the object of the Harrisons' testimony? It was to show that Lewis had taken the property from the crib, or while he was watching on the pier. To tell the jury that they could draw no inferences from the Harrisons' testimony was the same as telling them to disregard it altogether. The inference, if the jury believed the Harrisons, that Lewis took the watches out of the box while it was in the crib was quite natural. He was the detective employed to protect the pier and crib during the nights when the watch box was in the crib. Abraham Kissen, a witness for the plaintiff, was in the employ of the Fabre Line Steamship Company. The steamerLeopoldina was using the pier of the Fabre Line at the foot of Thirty-first street, Brooklyn. He had charge of all the cargo that was discharged from the steamer and the placing of it on the dock. He testified that package M-123 came off the Leopoldina
apparently in perfect condition. He also stated that prior to the time in question, the crib had been entered without lock and key. "I say it probably was entered at some time *Page 343 
without lock and key, * * * not forced, just walked over the top I suppose. [The top was open.] Q. Did someone tell you that, that someone had entered that cage? A. No; the only reason I say that is because I seen footsteps on top of cases in there. Q. Inside the crib? A. Inside the crib, at different times. Q. And from that you drew the conclusion that somebody had gone over the top? A. Correct."
It was not, therefore, an unreasonable and unwarranted inference that Roy Lewis, the watchman, had gone over the top of this crib or cage and had taken the watches from package M-123. The crib was open at the top. It was but ten or fifteen feet high. The package of jewels was on the inside of the crib. Roy Lewis was on the outside watching. He watched so diligently that watches came into his possession. Yet the counsel for the plaintiff and the court say that it is an unfair inference that Lewis stole the watches from the crib. It is far more likely that he took the watches while guarding them in the loneliness of the night hours with plenty of time to see that no one disturbed the watcher than it is to infer that he took them after they had entered into the possession of Coffey. Unless Coffey were in league with him it would be almost impossible to open the box and the tin container and take out the watches and put in stones while the packages were being loaded on to Coffey's truck or while they were being transported from the dock to the stores. It was certainly error, therefore, for the court to charge that there was no evidence from which the jury could infer that Lewis took the watches before they were delivered to Coffey, or out of the crib. As this was the crucial point in the case we do not see how this error was cured by the further remarks of the court, that the evidence of the Harrisons could be considered or that there was no evidence that Lewis did obtain the watches from Coffey. None of these statements put back in its place the fair inferences from the testimony of the *Page 344 
Harrisons which the judge had first told them about and then had withdrawn.
To this ruling of the court the counsel for the defendants duly excepted and we think this exception is good.
For these reasons and without passing upon the other questions relating to the bond and the right to sue without the consent of the United States government, we think the judgment must be reversed and a new trial ordered, with costs to abide the event.
HISCOCK, Ch. J., CARDOZO, POUND, McLAUGHLIN, ANDREWS and LEHMAN, JJ., concur.
Judgments reversed, etc.